# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-CR-290-APM** |
| **KELLYE SORELLE,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kellye SoRelle to 16 months of incarceration, three years of supervised release, $2000 in restitution, and a $125 special assessment for her misdemeanor and felony convictions. The requested 16-month sentence falls on the high end of the 10-16 months sentencing guidelines calculation agreed to by the government and SoRelle. As explained herein, the 16-month sentence appropriately reflects the gravity of SoRelle's conduct and participation with the Oath Keepers organization prior to, on, and following January 6, 2021.[1]

## I.    INTRODUCTION

SoRelle participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than

---

[1] The government refers to the Pre-Sentence Report (PSR) ¶¶ 48-78 for sentences this Court imposed on other members of the Oath Keepers who participated in the January 6 Capitol Riot.

one hundred police officers, and resulted in more than 2.9 million dollars in losses.[2]

SoRelle played a critical role within the Oath Keepers organization, in which she plotted with other members of the Oath Keepers to forcibly oppose the certification of the 2020 presidential election, joined the mob that attacked the Capitol on January 6, 2021, and directed and encouraged other Oath Keepers to destroy evidence of their criminal conduct after-the-fact.[3] SoRelle regularly collaborated with Oath Keepers Leader Elmer Stewart Rhodes III ("Rhodes") and other high level affiliates of the organization as they planned for their actions at the Capitol. On January 6, SoRelle used her platform to direct the actions of other members. She live streamed her actions on Facebook, proclaiming, "They broke the barrier, they got up there, they may end up inside before it's all said and done, and that's okay, too. That's how you take your government back, you literally take it back." As she traveled back to Texas on January 8, 2020, SoRelle messaged other Oath Keepers directing them to, "Please delete any information you've posted regarding the DC op and your involvement."

SoRelle's efforts to obstruct the investigation into the attack on the Capitol, like her participation in the attack itself, show a disdain for the rule of law that merits the government's recommended sentence. Therefore, the government recommends that the Court sentence SoRelle

---

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[3] The Oath Keepers are a large but loosely organized collection of individuals, some of whom are associated with militias. The organization's name alludes to the oath sworn by members of the miliary and police to defend the Constitution "from all enemies, foreign and domestic."

to 16 months of incarceration for her conviction on 18 U.S.C. 1512(b)(2)(A)-(B) and 18 U.S.C. 1752(a)(1) to reflect the gravity of her conduct and the need for deterrence.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 55, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    SoRelle's Role in the January 6, 2021, Attack on the Capitol

Kellye SoRelle is a 45-year-old resident of Granbury, Texas. She is a member of the Oath Keepers and was a close confidant to Oath Keepers' founder and leader, Rhodes. Within days of the 2020 presidential election, members and affiliates of the Oath Keepers, led by Rhodes, began discussing the need to oppose the transfer of power from President Donald J. Trump to President-Elect Joseph R. Biden, Jr., by any means necessary, up to and including the use of force. For example, on November 5, 2020, Rhodes sent a message to an encrypted Oath Keepers group chat called "Leadership intel sharing secured"—which included SoRelle—in which Rhodes stated, "We MUST refuse to accept Biden as a legitimate winner," and "We aren't getting through this without a civil war. Too late for that. Prepare your mind, body, spirit."

Two days later, on November 7, 2020—the date that President Trump was projected to have lost the Presidential Election—Rhodes wrote to SoRelle and the other chat group members: "[W]e must now do what the people of Serbia did when Milosevic stole their election - Refuse to accept it and march en-mass on the nation's Capitol." He then sent a link to a Bitchute.com video

3

titled "STEP BY STEP PROCEDURE, HOW WE WON WHEN MILOSEVIC STOLE OUR

ELECTIONS." Rhodes continued:

> I am in direct context with the Serbian author of that video. His videos are excellent. Here is his written advice to us:
>
> - Peaceful protests, good, well played round 1
>
> - A complete civil disobedience, they are not your representatives. They are FOREIGN puppet government.
>
> - Connect with the local police and start organize by neighborhoods to stay safe (we didn't need this step)
>
> - We swarmed the streets and started confronting the opponents. I know, not nice, but it must be done if the institutions stop to exist
>
> - Millions gathered in our capital. There were no barricades strong enough to stop them, nor the police determined enough to stop them
>
> - Police and Military aligned with the people after few hours of fist-fight
>
> - We stormed the Parliament
>
> - And burned down fake state Television!
>
> WE WON!"

On November 9, 2020, Rhodes held a private GoToMeeting—an online meeting site that

allows users to host conference calls and video conferences via the Internet—limited to Oath

Keepers members, titled, "Oath Keepers National Call – Members Only." SoRelle attended and

participated in the meeting. During the meeting, Rhodes outlined a plan to stop the lawful transfer

of presidential power, including preparations for the use of force, and urged those listening to

participate. As one participant described the meeting, "The more I listened to the call, it sounded

like we were going to war against the United States government . . . . It sounded like we were

going to war with—we were going to overthrow the United States government and start shooting everybody." *U.S. v. Elmer Stewart Rhodes III*, et al, 22-cr-15, Tr. Tran at 2045.

Some Oath Keepers left or distanced themselves from the group as a result of these calls for violence. By contrast, SoRelle continued to collaborate with Rhodes and other members and affiliates of the Oath Keepers on ways to oppose the results of the election. One project that SoRelle worked on with Rhodes was a series of two letters to President Trump, which Rhodes tried to have personally delivered, but which he ultimately published to the Oath Keepers' website on December 14 and December 23, 2020. In these letters, which were signed by both Rhodes and SoRelle, they urged President Trump, "Act Now! Do Not Wait for Jan 6!" In the second letter, Rhodes and SoRelle warned the president, "If you fail to do your duty, you will leave We the People no choice but to walk in the Founders footsteps . . . . , by declaring the regime illegitimate, incapable of representing us, destructive of the just ends of government—to secure our liberty— and to be a mere puppet of a deadly foreign enemy. And, like the Founding generation, we will take to arms in defense of our God given liberty, we will declare our independence from that puppet regime, and we will fight for our liberty."

On December 29, 2020, Rhodes directly messaged SoRelle, "This will be DC rally number three. Getting kinda old. They don't give a shit how many show up and wave a sign, pray, or yell. They won't fear us till we come with rifles in hand."

On December 31, 2020, Rhodes messaged those on the "Leadership intel sharing secured" group, including SoRelle, "On the 6th, they are going to put the final nail in the coffin of this Republic, unless we fight our way out. With Trump (preferably) or without him, we have no choice."

On January 3, 2021, SoRelle left Texas with Rhodes and began driving towards Washington, D.C., to be part of the Oath Keepers' January 6 operation. On the way, Rhodes purchased or picked up more than $20,000's worth of firearms-related equipment with SoRelle.

On the morning of January 6, 2021, SoRelle traveled with Rhodes to the area near the Capitol.

When the riot at the Capitol began to unfold, SoRelle messaged the "Leadership intel sharing secured" chat[4], at about 1:31 p.m., "We are acting like the founding fathers—can't stand down. Per Stewart, and I concur." Rhodes also directed his Oath Keeper followers to the Capitol. Ultimately, at least 20 of Rhodes' followers breached the Capitol.

At about 2:12 p.m., SoRelle accompanied Rhodes and another Oath Keeper affiliate onto the Capitol complex and into the restricted areas of the Capitol grounds. Video footage captured the group passing the barriers that law enforcement had initially set up to protect the Capitol.

---

[4] The "Leadership intel sharing secured" Signal Chat, later renamed to the "OLD Leadership CHAT", included multiple members of the Oath Keeprers leadership including SoRelle, Rhodes, Michael Greene, and multiple other co-conspirators.



*SoRelle, with Rhodes, entering the restricted area on the east side of the Capitol.*

As she entered the restricted area of the Capitol grounds, SoRelle live-streamed a video of

herself to Facebook, in which she told her followers:

> I want to show y'all something, probably one of the coolest damn things I've ever
> seen in my entire life. I'm telling you right now, government, people are pissed, but
> you guys need to watch. They broke the line, guys. People are going. This isn't a
> bad thing, and you can't be scared. This is what you do. Otherwise you end up as
> Communist little peasants, in little societies where you have no ability, no voice,
> no vote. You're basically slaves. But this is what happens when the people are
> pissed and when they rise up.    So you know what, guys? It's pretty amazing. You
> guys should enjoy it. They broke the barrier, they got up there, they may end up
> inside before it's all said and done, and that's okay, too. That's how you take your
> government back. You literally take it back.

SoRelle then joined Rhodes and the other Oath Keepers affiliates in moving around the north side of the building, toward the upper west terrace of the Capitol.

As they moved, SoRelle continued to document the riot over a Facebook live-stream video. As she moved around the building, SoRelle told those watching: "Over the top, they've occupied both sides now. Oh no! Think we're gonna hang 'til the 20th or what? Don't know."    As she walked closer to the building, SoRelle continued, "Here you go, just so you can see, they had barricades up. Keeping us away from the building was the goal."



*SoRelle and Rhodes walking along the north terrace of the Capitol, within the restricted area.*

As SoRelle, Rhodes, and the other Oath Keeper affiliate stood on the Upper West Terrace of the Capitol and watched rioters streaming into the building, the other affiliate stated, "They gotta be shitting their pants inside right now." SoRelle laughed, and said, "Oh! It's hilarious!" Rhodes responded, "Amen. They need to shit their fucking pants." SoRelle agreed: "They should

be." Rhodes then stated, "Sic semper tyrannis," Latin for "Thus unto tyrants," and famously known

as what John Wilkes Boothe shouted after he assassinated President Abraham Lincoln.



*SoRelle, Rhodes, and a third Oath Keeper affiliate observe rioters breaking into the Capitol and laugh about how terrified the people inside must be.*

Although SoRelle did not personally enter the Capitol Building on January 6, she

understood the role those inside and outside the building, like herself, played in delaying the

certification proceeding that had been taking place inside the Capitol. SoRelle was aware of the

role that Vice President Michael R. Pence was meant to play in the certification of the Electoral

College vote, and that he was present at the Capitol, presiding over the certification proceeding, when the riot unfolded.

### *SoRelle's Flight and Encouragement of Destruction of Evidence*

On the evening of January 6, 2021, SoRelle joined Rhodes and other Oath Keepers for a celebratory dinner. During the course of the dinner, someone received word that law enforcement was either arresting or looking for those involved in the attack on the Capitol. Those in the group, including Rhodes and SoRelle, hastily left the restaurant and returned to their hotel, packed all of their belongings, and met at a nearby gas station.

At the gas station, Rhodes turned off his cell phone and gave it to SoRelle in case law enforcement was tracking the device. He then rode with a different Oath Keeper affiliate, and SoRelle departed in her own vehicle. SoRelle rendezvoused with Rhodes in Tennessee, and the two continued driving towards Alabama, and ultimately back to Texas.

On the way, on January 8, 2020, Rhodes and SoRelle both sent messages from SoRelle's phone (since Rhodes' phone was turned off, to avoid tracking by law enforcement), encouraging Oath Keeper affiliates to delete any incriminating evidence of their involvement, or their fellow Oath Keepers' involvement, in the events of January 6.

SoRelle wrote to a Signal group chat called "DC Op: Jan 6 21," "Please delete any information you've posted regarding the DC op and your involvement. This thread will be deleted when possible." She continued, "Per SR – clean up all your chats."

Another post from SoRelle directed, "YOU ALL NEED TO DELETE ANY OF YOUR COMMENTS ABOUT WHO DID WHAT." The message continued, "I can't delete them because this is a legacy Signal chat that doesn't let me delete comments. Only the comment author

can delete a comment. So GET BUSY. DELETE your self-incriminating comments or those that can incriminate others."

Other Oath Keepers followed SoRelle's and Rhodes' orders and deleted messages, photographs, and videos from their phones and other devices that contained evidence of their participation and other Oath Keepers' participation in the attack on the Capitol.

### III.    THE CHARGES AND PLEA AGREEMENT

On August 31, 2022, a federal grand jury returned an indictment charging SoRelle with four counts, including entering and remaining in a restricted building or grounds in violation of 18 U.S.C. §1752(a)(1) (Count Three) and Obstruction of Justice – Tampering with Documents in violation of 18 U.S.C. §1512(b)(2)(A)-(B) (Count Four). On August 21, 2024, this Court convicted SoRelle of Counts Three and Four based on a guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

SoRelle now faces sentencing on 18 U.S.C. §1752(a)(1) and 18 U.S.C. §1512(b)(2)(A)-(B). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, SoRelle faces up to 1 year of imprisonment, a term of supervised release of not more than 1 year, a fine up to $100,000, restitution, and a mandatory special assessment of $25 on Count Three and 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on Count Four.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The parties agree that the following Sentencing Guidelines apply:

Count Three: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3 | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A) | Specific Offense Characteristic | +2 |
| U.S.S.G. § 3C1.1 | Obstruction | +2 |
| | **Total** | **8** |

Count Three: 18 U.S.C. §1512(b)(2)(A)-(B)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2 | Base Offense Level | 14 |
| | **Total** | **14** |
| Acceptance of responsibility (U.S.S.G. § 3E1.1) | | -2 |
| **Total Adjusted Offense Level:** | | **12** |

*See* ECF No. 53 ("Plea Agreement") at 3.

The U.S. Probation Office agrees with both the Chapter Two Guidelines section (U.S.S.G. § 2B2.3 and 2J2.2) and the Chapter Three adjustment (U.S.S.G. § 3E1.1) applied above.[5] PSR ¶¶

---

[5] Probation also added a specific offense characteristic for the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objections under U.S.S.G. § 2J1.2(b)(3)(A) and (C) and an adjustment for SoRelle's role as an organizer, leader, manager, or supervisor under U.S.S.G. § 3B1.1(c). This resulted in Probation calculating a total adjusted offense level of 16 instead of 12.   PSR ¶¶ 105, 107, 109, and 112. Pursuant to the Plea Agreement, "[t]he parties… reserve the right to address the correctness of any Sentencing Guidelines calculations determined by the presentence report writer or the court, even if those calculations differ from the Estimated Guidelines Range calculated herein."   Plea Agreement at 5. Accordingly, the government acknowledges Probation's guidelines calculations reflect SoRelle's conduct with the Oath Keeps organization and her involvement in the Riot on January 6, 2021. However, the parties' plea agreement did not contemplate the inclusion of a specific offense characteristic U.S.S.G. § 2J1.2(b)(3)(A) and (C) or an adjustment under U.S.S.G. § 3B1.1(c), and the parties' agreed-upon total adjusted offense level was 12, which would result in a Guidelines range of 10-16 months, assuming a Criminal History Category of I (as is true here). *See* Plea Agreement at 4. The government believes in the fairness of the plea agreement and advocates for a recommendation – 16 months of incarceration – that is within the advisory Guidelines range in the plea agreement (and that *does not* include the above referenced specific offense characteristic and adjustment).   The government believes that this sentence within the agreed-upon Guideline

102, 103, and 104. The government agrees with Probation that SoRelle is not eligible for an adjustment pursuant to U.S.S.G. § 4C1.1 because SoRelle was part of a criminal scheme to violently prevent the peaceful transfer of power. PSR ¶ 111. SoRelle planned with senior members of the Oath Keepers to oppose the lawful transfer of power following the 2020 presidential election. This included establishing a "quick reaction force" stationed in Arlington, Virginia to support their January 6 operation, if necessary.

The U.S. Probation Office calculated SoRelle's criminal history as category I, which is not disputed. PSR ¶ 115; Plea Agreement at 4. Accordingly, based on the parties' calculation of SoRelle's total adjusted offense level, after acceptance of responsibility, at 12, SoRelle's Guidelines range is 10 to 16 months' imprisonment.

After determining the SoRelle's Guidelines range, the Court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). In this case, a sentence at the high end of the guidelines is appropriate but only begins to capture the unprecedented and uniquely harmful nature of SoRelle's crimes, which struck at the heart of our democracy and the rule of law. SoRelle's actions and the arguments below make it clear that – while the government is not advocating for an upward variance considering the application of the Special Offense Characteristic or Adjustment noted in Paragraphs 105 and 107 of the PSR – the high end of the Guidelines is not only reasonable, but fully balances SoRelle's conduct and the circumstances in which she committed said conduct. This included her leadership role within the Oath Keeper's and her advocacy for the destruction of evidence in the riot's wake. SoRelle has already realized a great benefit with her negotiated plea and guidelines range, and her actions leading up to January 6, and after, do not support a downward

_____

range is sufficient to achieve statutory goals and appropriate in the instant case.

departure or variance. Thus, a sentence at the high end of SoRelle's 10-16 month guidelines range properly "reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, SoRelle's conduct surrounding January 6, 2021, was aimed at preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. SoRelle's participation on January 6, 2021, was not spontaneous. It followed weeks of plotting with other senior members of Oath Keepers leadership to forcibly oppose the certification of the election. This Court observed the seriousness of this scheme while admonishing Oath Keeper Leader Stewart Rhodes, characterizing it as, "a series of acts in which you and others committed to use force, including potentially with weapons, against the government of the United States as it transitioned from one President to the other," is "among the most serious crimes an individual American can commit." *United States v. Rhodes, et al.*, No. 22-cr-15, 5/25/23AM Tr. at 113. ("It is an offense against the government to use force. It is an offense against the people of the country.") *Id.*

SoRelle was part of this. She and other Oath Keepers went to the Capitol to execute their plan. Only after it failed and the prospect of an ensuing criminal investigation arose, did SoRelle direct members of the Oath Keepers to destroy evidence of their conspiracy. SoRelle was involved

in this conspiracy at the highest levels and attempted to prevent authorities from uncovering evidence of this scheme. Therefore, the nature and circumstances of SoRelle's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 16 months incarceration.

### B. The History and Characteristics of SoRelle

SoRelle, a 46-year-old Texas native, is an attorney and former prosecutor in Texas. PSR ¶ 27. SoRelle reported a "fine" upbringing characterized by financial stability, albeit with some family challenges arising from an alcoholic stepfather and an absent biological father. PSR ¶¶ 121, 123. SoRelle has four children with her ex-husband. PSR ¶ 124.

SoRelle attended college at the University of Central Oklahoma and law school at Oklahoma City University. PSR ¶ 150. SoRelle described herself as a "skilled" attorney who primarily practiced immigration, family, and juvenile law in Granbury, Texas. PSR ¶¶ 153, 155. SoRelle also spent 6 years as an assistant D.A. in Brownsville, Texas earning approximately $80,000 per year as a supervising attorney. [6] PSR ¶ 162. SoRelle continued to maintain employment as an attorney until facing the instant offense. PSR ¶¶ 159, 160. SoRelle reported a "historic" affiliation with the Oath Keepers but declined to provide Probation with additional details of her involvement. PSR ¶¶ 131. However, in messages uncovered by investigators, SoRelle represented herself as "counsel" for the Oath Keepers and "a potential attorney for you," using her experience in criminal justice to facilitate her crimes, underscoring the depravity of her actions.

---

[6] The PSR indicated that SoRelle would not be considered for re-employment with the Cameron County District Attorney's Office in Brownsville, Texas. PSR ¶ 162

15

Aside from the present cases, SoRelle reported she has never been diagnosed with mental health ailments nor required mental health treatment for a psychiatric impairment. PSR ¶¶ 138, 140. SoRelle also reported that shortly after her release on bond in this case, she completed four sessions of mental health counseling with the Kimball County Mental Health Center where it was determined she did not need continued services. PSR ¶ 138. However, SoRelle was admitted to the Bureau of Prisons on November 27, 2023, for a 70-day competency evaluation after describing delusional ideations. PSR ¶ 140, ECF No. 39. SoRelle was released from the Bureau of Prisons on April 25, 2023, after a competency evaluation concluded SoRelle "appeared competent" and was able to assist in her own defense.[7] PSR ¶ 140.

Yet, despite her proven professional success, lack of psychological conditions prior to April 2023, and lack of criminal history, SoRelle made the conscious choice to plan for and participate in the Riot on January 6. But unlike many of the other rioters at the Capitol, SoRelle's nefarious conduct was not limited to the crimes she committed on January 6 or in the immediate aftermath. She was an active member of an organization that anticipated the violence at the Capitol and acted as close confidant to the highest levels of leadership. And as opposed to many crimes generally, SoRelle's crimes surrounding January 6 were not crimes of passion or desperation: they were calculated and ideologically motivated, warranting a prolonged sentence of incarceration.

---

[7] The government refers to PSR ¶¶ 138-144 for an overview of SoRelle's psychological condition from April 2023 – March 2024, including the results of various psychological evaluations performed on SoRelle during this time.

16

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. SoRelle's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

Given the seriousness of SoRelle's actions, the absence of a criminal background or subsequent mental health problems, do not lessen SoRelle's culpability or propensity to commit this type of offense again, should similar circumstances present themselves. SoRelle planned with the highest echelons of Oath Keepers leadership for January 6 to disrupt the certification of the 2020 presidential election through violent force, if necessary. Once these plans failed and the prospect of a criminal investigation arose, she and Stewart Rhodes directed other Oath Keepers to delete evidence of their crimes. And many of the rank and file followed this directive deleting messages, photographs, and videos from their phones and other devices that contained evidence of their participation in the attack on the Capitol. This required the government to expend

---

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

substantial resources to execute additional search warrants to recover this evidence, if the evidence was recovered at all. *See United States v. Rhodes, et al.*, No. 22-cr-15, 10/4/22 PM Tr. at 1623, Testimony of Special Agent John Moore ("We don't know what was deleted that we couldn't recover.").

Perhaps most aggravating was SoRelle's effort to obstruct justice as a lawyer and former prosecutor. She had an acute familiarity with the criminal justice system and used that knowledge to effectuate her crimes. She directed her affiliates to delete "self-incriminating comments or those than can incriminate others." In the uncertain and chaotic aftermath of January 6, many Oath Keepers reckoned with the potential criminal exposure for their actions. SoRelle's directives, coming from an attorney working in close coordination with Oath Keeper leader Stewart Rhodes, carried weight and had an intended purpose: to obstruct law enforcement's ability to uncover the gravity of their plans and hold the Oath Keepers accountable for this conspiracy.

While SoRelle has accepted responsibility for her conduct by pleading guilty, she does not appear to feel any remorse for her actions and has actively tried to minimize her obstructive conduct. At the plea hearing, SoRelle equivocated on the nature and amount of messages she sent to Oath Keepers concerning the destruction of evidence. She reluctantly acknowledged that, from what she could recall, she sent at least one message directing the destruction of evidence but only after a colloquy with the Court concerning this ambiguity.[9] Her attempts to sidestep her actions and diminish her culpability goes directly to her likelihood of committing the same offenses again, should similar circumstances present themselves. Her conduct warrants a significant sentence.

---

[9] The government does not have a transcript of the plea proceedings and offers generalizations of SoRelle's colloquy with the Court.

Indeed, other Courts have taken seriously, and imposed significant sentences on, crimes involving evidence impairment and destruction following a defendant's offenses on January 6, 2021. In *United States v. William Reid,* 21-cr-316 (DLF), Judge Friedrich imposed a 37-month sentence following Reid's conviction on 18 U.S.C. 1512(c)(1) and related misdemeanor offenses on January 6, 2021. Notably, Reid, like SoRelle, attempted to hide evidence of his conduct after learning of the FBI investigation against him. Reid admitted to law enforcement that after law enforcement arrived at this home with an arrest warrant, and an accompanying search warrant for his cell phone, Reid hid his cellphone with the intent to impair its availability for use in his own criminal case and the ongoing investigation into the January 6, 2021, attack. During Reid's sentencing proceedings, Judge Friedrich addressed the seriousness of this conduct by admonishing, "[] He obstructed justice in a pretty significant way, I think. I view hiding, destroying, whatever he did with the cell phone as pretty significant." *See United States v. Reid,* 21-cr-316 (DLF), ECF 59 at 30. This Court should view SoRelle's conduct as equally, if not more significant, given SoRelle's attempt to persuade others to join her in this criminality.

It is critically important for January 6 sentences to promote respect for the law and deter future crime, especially where the defendant is a former prosecutor. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law. Here, SoRelle not only planned and participated in the attack on the Capitol but also sought to destroy evidence of her involvement. Thus, the need for a significant sentence of incarceration is even more important for an offender like SoRelle to deter others from engaging in similarly obstructive conduct and to promote respect for the rule of law.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[10] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that SoRelle must pay $2,000 in restitution, which reflects in part the role SoRelle played in the riot on January 6.[11] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

governmental agencies as of July 2023. *Id.* SoRelle's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 206.

## VIII.   FINE

SoRelle's convictions subject her to a statutory maximum fine of 100,000 for violating 18 U.S.C. § 1752(a)(1) (Count Three) and $250,000 for violating 18 U.S.C. § 1512(b)(2)(A)-(B) (Count Four). *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, SoRelle's financial assets set forth in the PSR suggest that SoRelle is unable, and is unlikely to become able, to pay a fine. PSR ¶ 165.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 16 months of incarceration, three years supervised release, $2000 in restitution, and a $125 special assessment for her misdemeanor and felony convictions.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    */s/ Kathryn Rakoczy*
        Kathryn L. Rakoczy
        Assistant United States Attorney
        D.C. Bar Number 994559
        U.S. Attorney's Office for the District of Columbia

601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-6928
Email: Kathryn.Rakoczy@usdoj.gov

*/s/ Eli Ross*
Eli Ross
Assistant United States Attorney
Bar No. IL 6321411
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 297-1515
Email: Eli.Ross@usdoj.gov

*/s/ Rebekah Lederer*
Rebekah Lederer
Pennsylvania Bar No. 320922
Assistant United States Attorney
U.S Attorney's Office for District of Columbia
601 D St. N.W
Washington, DC 20530
Tel. No. (202) 252-7012
rebekah.lederer@usdoj.gov